UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| FRANK DOUGLAS D'AMICO, | ) | NO:    2:19-cv-12628 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Judge:** |
| Versus | ) | **Magistrate:** |
| | ) | |
| JUUL LABS, INC.,  PAX LABS, INC.,  and | ) | |
| ALTRIA GROUP,  INC., | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| **Defendants.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| _____ | ) | |

FRANK DOUGLAS D'AMICO ("Plaintiff"), by and through his undersigned counsel,

brings this action on his own behalf, and on behalf of a Class of persons defined herein, against

JUUL Labs, Inc., PAX Labs, Inc., and Altria Group, Inc. (collectively "Defendants" or

"JUUL"), and alleges upon information and belief and based on the investigation to date of his

counsel as follows:

## INTRODUCTION

1.     This action is brought individually by Plaintiff and on behalf of a class of persons

similarly situated (the "Class" or "Class Members") who purchased JUUL e-cigarettes and/or

JUUL pods ("JUUL e-cigarettes" or "Product"). Plaintiff brings this action to remedy violations

of law in connection with Defendants' unfair and unlawful marketing, advertising, and sale of

these products, which are highly addictive, unsafe, and nevertheless immensely popular among

adult and underage nonsmokers. Defendants used a systematic marketing campaign to dupe

consumers into believing that JUUL e-cigarettes were safe and fun to use, all the while failing to

disclose the addictive nature of the Products, as well the serious health risks they pose. Namely,

JUUL failed to disclose that its e-cigarettes can lead to diseases, including but not limited to:

nicotine addiction, heart disease, stroke, cancer, as well as mental health problems.

2.      Defendants have maintained a stronghold in the e-cigarette industry since the

release of JUUL e-cigarettes in June 2015. At that time, JUUL was owned by PAX Labs, Inc.

("PAX Labs), a popular manufacturer of vaporizers. PAX Labs announced its new e-cigarette,

JUUL, as a faster and more satisfying way of achieving peak nicotine satisfaction, going so far as

to claim that it was a "healthier cigarette." [1] However, the company immediately eschewed any

notion of informing consumers about the potential health risks of the JUUL e-cigarette, offering in

a statement to the press: "We don't think a lot about addiction here because we're not trying to

design a cessation product at all…anything about health is not close on our mind." [2] It was,

therefore, clear from the Product's launch that the company knew that its e-cigarette caused health

risks, and yet made a strategic decision not to disclose those risks for commercial gain.

3.      Even then the health problems caused by e-cigarettes were no secret. The Food and

Drug Administration had already expressed concerns about the proliferation of e-cigarettes among

youth and nonsmokers, publicly discussing plans to regulate the industry as far back as 2013. [3]

Contemporaneously, several medical studies were published showing that, among other illnesses,

e-cigarette exposure resulted in obstructed respiratory function and compromised immune system

---

[1] Nitasha Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette*, The Verge (Apr. 25, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.
[2] *Id.*
[3] Tim Devaney, *FDA proposes regulations for e-cigarettes*, The Hill (Apr. 24, 2014), https://thehill.com/regulation/healthcare/204258-fda-proposes-e-cig-regs

functioning.[4] Furthermore, the Centers for Disease Control reported that e-cigarette use among middle and high school-aged students had increased by 900 percent, an alarming trend among children whose brains were still developing.[5]

4.      Nevertheless, PAX Labs launched an aggressive marketing campaign for the JUUL e-cigarette, targeting youth and nonsmokers with colorful advertisements featuring men and women in their 20s and 30s, often at parties or in provocative clothing. The advertisements invited users to "party" with the new e-cigarette product, thereby promoting the e-cigarette as a fun, social experience, without mention of the device's potential health consequences.



---

[4] Thomas E. Sussan, et al., *Exposure to Electronic Cigarettes Impairs Pulmonary Anti-Bacterial and Anti-Viral Defenses in a Mouse Model*, PLOS One (Feb. 4, 2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0116861
[5] Centers for Disease Control, *Surgeon General's Advisory on E-cigarette Use Among Youth*, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html (last visited Aug. 4, 2019).

5.      As a direct result of JUUL's marketing efforts, the use of e-cigarettes continued to rise between 2015 and 2017, and the industry reported 150 million dollars in sales at the end of 2017. By then, JUUL e-cigarettes accounted for 40 percent of the retail market share.[6] Due to the Product's success, JUUL was spun out of PAX Labs as an independent company in 2017.[7]

6.      As its own entity, JUUL further intensified its marketing efforts, targeting underage users and nonsmokers with glamorized social media campaigns, which promoted a lifestyle of relaxation, freedom, and sex appeal.[8] Additionally, the company offered frequent discounts, free samples to users, and went so far as to launch of a line of brightly-colored, candy-flavored e-cigarettes. The use of the JUUL product came to be known as "Juuling," and the press frequently described the Product the "iPhone of cigarettes."[9]



---

[6] Jidong Huant et al., *Vaping Versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control (Feb. 22, 2019), https://tobaccocontrol.bmj.com/content/28/2/146.
[7] *See generally* Ari Levy, *E-cigarette maker Juul is raising $150 million after spinning out of vaping company*, CNBC (Dec. 19, 2017), https://www.cnbc.com/2017/12/19/juul-labs-raising-150-million-in-debt-after-spinning-out-of-pax.html.
[8] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#b6a355214f9c.
[9] Ben Radding, *Pax Juul: the Iphone of E-cigs?*, Men's Journal, https://www.mensjournal.com/gear/pax-juul-iphone-e-cigs/ (last visited Aug. 4, 2019).

7.     JUUL announced 1 billion dollars in sales in 2018.[10] It currently comprises nearly three-quarters of the U.S. e-cigarette market.[11] JUUL's projected revenue for 2019 is $3.4 billion.[12] Despite its continued rise in popularity and skyrocketing profits, JUUL has continued to downplay or outright lie about the health effects its e-cigarettes have on consumers. In 2019, a congressional investigation found that JUUL sponsored youth programs and summer camps in several American cities, where company representatives frequently touted their Product as "totally safe" to middle and high school aged children.[13] These efforts to mislead young consumers proved successful: a recent study found that 63 percent of surveyed 15 to 24 year-olds were unaware that the JUUL e-cigarette contained nicotine.[14]

8.     As JUUL's continued efforts to deceive youth and nonsmokers have come to light, the company has attempted to conceal and distort its fraudulent conduct by rebranding itself, now claiming that the JUUL e-cigarette is designed only to assist adult smokers with smoking cessation and/or to provide them with a healthier alternative to a cigarette.[15] This is simply false. Notwithstanding the company's own comments about its indifference to the health and safety of users as far back as 2015, JUUL e-cigarettes have not been approved by the FDA as a smoking cessation device.

---

[10] Reuters, *Juul annual sales projected to top $3 billion after profitable 2018*, https://www.reuters.com/article/us-juul-outlook/juul-annual-sales-projected-to-top-3-billion-after-profitable-2018-bloomberg-idUSKCN1QB1AZ (last visited Aug. 4, 2019).

[11] Campaign for Tobacco Free Kids, *Juul E-Cigarettes: Fueling a Youth Epidemic*, TobaccoFreeKids.com, https://www.tobaccofreekids.org/what-we-do/industry-watch/e-cigarettes (last visited Aug. 7, 2019).

[12] https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban

[13] Kalyan Kumar, Juul Vape Spent $200K to Market E-Cig to Teens Despite Youth Vaping Apology, International Business Times (July 29, 2019), https://www.ibtimes.com/juul-vape-spent-200k-market-e-cig-teens-despite-youth-vaping-apology-2809538.

[14] Truth Initiative, *Juul e-cigarettes gain popularity among youth, but awareness of nicotine presence remains low*, TruthInitiative.org, https://truthinitiative.org/press/press-release/juul-e-cigarettes-gain-popularity-among-youth-awareness-nicotine-presence (last visited Aug. 6, 2019).

[15] JUUL, Our Responsibility, Juul.com, https://www.juul.com/our-responsibility (last visited Aug. 6, 2019).

9.   Indeed, the FDA, Center for Tobacco Products Director wrote to Juul Labs, Inc.'s CEO Kevin Burns on September 9, 2019 expressing the FDA's concern about JUUL's marketing, advertising, promotional, and education campaigns, as well as certain product development activity, and requesting information and documents regarding same.  The FDA letter states "[w]e were particularly troubled by recent testimony provided to the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform of the United States House of Representatives . . .  [that] revealed JUUL engaged in a wide variety of promotional activities and outreach efforts to persuade potential customers, including youth, to use JUUL products. Witnesses testified, for example, that JUUL advertising saturated social media channels frequented by underage teens and that JUUL used influencers and discount coupons to attract new customers."[16]

10.   Defendants have profited for years from creating and addicting a new generation of underage and adult nonsmokers through the use of a fraudulent marketing campaign and systematic misrepresentations and omissions about the health effects of using the JUUL e-cigarette. This case seeks to redress the harm that Defendants have done to a Class of consumers, who were misled and deceived by JUUL's dangerous and unfair business activities.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000.00, exclusive of interests and costs, and many Members of the proposed Class are citizens of states different from that of the Defendants. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

---

[16] See https://www.fda.gov/media/130604/download

6

12.     The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this judicial district and division, and intentionally and purposefully directed the Product into the stream of commerce, including the sale and distribution of the Product within the State of Louisiana.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District.

14.     Venue is also proper in this judicial district because Plaintiff resides in this district.

## **PARTIES**

15.     FRANK DOUGLAS D'AMICO is an individual and resident of the State of Louisiana, residing in the Town of Kentwood, in the Parish of Tangipahoa.

16.     Defendant PAX Labs, Inc. ("PAX") is a Delaware corporation, having its principal place of business in San Francisco, California.

17.     Defendant JUUL Labs, Inc. ("JUUL"), is a Delaware corporation with a principal place of business in San Francisco, California. JUUL manufactures, designs, sells, markets, promotes, and distributes JUUL e-cigarettes.

18.     Defendant, Altria Group, Inc. ("Altria"), is a Virginia corporation with a principal place of business in Richmond, Virginia. Altria maintains a 35 percent ownership interest in JUUL as of 2018.

## GENERAL FACTUAL ALLEGATIONS

### A. The JUUL E-cigarette

19.      The JUUL e-cigarette is a rechargeable smoking device that can be held in one's palm. It is a small, rectangular unit containing a rechargeable battery and heating agent. It holds a nicotine cartridge called a "JUUL pod," which contains a patented nicotine solution. The JUUL pod clicks into the e-cigarette for easy use.

20.      These pods are sold in a variety of flavors, such as mango, cool mint, and fruit medley and contain 20 cigarettes worth of nicotine, or about 200 puffs.[17] A JUUL starter kit, including the device and pods, costs $49.99. The individual pods cost $15.99.[18]

21.      The device operates by detecting suction from the user. It thereafter heats itself and converts the nicotine solution in the pod into a vapor, which is then aspirated into the user's lungs. The vapor consists of nicotine, glycol, and benzoic acid.[19] The result is immediate relaxation and a sharp nicotine peak in the user's blood system approximately five minutes after his or her first puff. Many young users report feeling a short-term high upon inhalation, "almost like being drunk.[20]"

22.      Ultimately, the JUUL e-cigarette contains more than twice the concentration of nicotine than in its closest competitor, as well as a greater quantity of benzoic acid, which can cause cough, sore, throat, abdominal pain, nausea, and vomiting.[21]

---

[17] Truth Initiative, *How Much Nicotine is in JUUL?*, TruthInitiative.org, https://truthinitiative.org/research-resources/emerging-tobacco-products/how-much-nicotine-juul (last visited Aug. 6, 2019).
[18] Emma Kate Fittes, *Here's everything you need to know about vape, Juul, e-cigarettes and the FDA, Indianapolis Star* (Sept. 12, 2018), https://www.indystar.com/story/news/health/2018/09/12/fda-cracks-down-juul-e-cigarettes-what-parents-should-know-vaping-epidemic-kids-nicotine-dangers/1278519002/.
[19] Cleveland Clinic Health, What You Should Know about JUUL, MartinHealth.org, https://www.martinhealth.org/what-you-should-know-about-juul (last visited Aug. 7, 2019).
[20] Sabrina Castle, *Too Juul For School*, Free Press Online (Feb. 13, 2018), https://www.fsfreepressonline.com/features/2018/02/13/too-juul-for-school/.
[21] John-Anthony Fraga, *The Danges of Juuling*, National Center for Health Research, http://www.center4research.org/the-dangers-of-juuling/ (last visited Aug. 6, 2019).

23.     Despite the Product's evidently dangerous characteristics, JUUL product labels did not contain a warning about the quantity of nicotine in the Product or the addictive nature of the substance until 2018.[22]

24.     The JUUL e-cigarette is sold nationwide, online and in various retail stores.

25.     Within 1 mile of Plaintiff's home, there are several retailers selling the Product, rendering it easily accessible to him.

**B. JUUL's Systematic Deception**

26.     A January 2019 report published by the Stanford University School of Medicine concluded that Defendants have aggressively marketed e-cigarettes to youth and young adult nonsmokers since the JUUL e-cigarette product's launch in 2015.[23]

27.     Using data derived from JUUL's advertising, social media presence, and customer-directed e-mails, the report found that as early as the Summer of 2015, attractive young JUUL sales representative began distributing free JUUL e-cigarettes at movie and music events. The report stated that: "The principal focus of these activities was to get a group of youthful influencers to accept gifts of Juul products."[24]

28.     The company thereafter launched a clever "Vaporized" print campaign, featuring an image of the device alongside attractive individuals in their 20s. These highly stylized, colorful images displayed these individuals smoking, making comical faces, in provocative poses, or otherwise appearing as though they were having an enjoyable time.

---

[22] Ashley Godwin, *JUUL releases new look with bigger warning label*, Fourstateshomepage.com (October 11, 2018), https://www.fourstateshomepage.com/news/juul-releases-new-look-with-bigger-warning-label-after-fda-warning/.
[23] Robert K. Jackler et al., *JUUL Advertising Over its First Three Years on the Market*, Stanford University School of Medicine (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[24] *Id*. at p.6.



29.     These methods were not new: JUUL advertisements bore strong similarities to cigarette ads for Marlboro, concluded the Stanford researchers in a separate study, demonstrating that JUUL likely mimicked successful marketing techniques once deployed by Big Tobacco.[25]



---

[25] Altria, Inc., one of the named Defendants in this action, owns Phillip Morris, the maker of Marlboro cigarettes. *See* http://www.altria.com/About-Altria/At-A-Glance/Pages/default.aspx.

30. JUUL's insidious efforts paid off: in its first two years on the market, JUUL's sales increased 641 percent.[26]

31. JUUL also created a strong presence on social media, frequently publishing videos on YouTube and establishing pages on Instagram and Twitter. The company hired social media "influencers," or individuals with large followings on Instagram or Twitter, to promote their products. Images such as the one below demonstrate JUUL's use of sex appeal to lure a young audience on Instagram.



---

[26] Truth Initiative, *Juul sales increase more than 600%*, TruthInitiative.org, https://truthinitiative.org/research-resources/emerging-tobacco-products/juul-sales-increase-more-600-year-underscoring (last visited August 6, 2019).

32.     The result was a cunning marketing campaign that targeted primarily children and young adults, by portraying JUUL e-cigarettes as fashionable and trendy, rather than addictive and harmful. No images from the Vaporized campaign contained information about nicotine or its harmful effects.

33.     Thereafter, JUUL launched a line of candy-flavored e-cigarettes, featuring flavors like "Mango" and "Fruit Medley." Evidence of the Product's appeal to youth was immediate: a national survey found that that 81 percent of children between ages 12 and 17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product.[27]  Moreover, 81.5 percent of youth e-cigarette users said they used e-cigarettes because they enjoyed the flavors.[28]



34.     As JUUL's popularity continued to grow, particularly among children and teens, the public and government officials became increasingly concerned about the device's impact on consumer health. Rather than being transparent about the Product's health risks, JUUL doubled

---

[27] *See* Andrea C. Villanti, *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years*, Journal of the American Medical Association (October 26, 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5522636/.
[28] *Id.*

down on its youth targeted campaigns, going so far as to send representatives to high school classrooms across the country to vouch for the Product's safety. [29]

35.     During a 2019 hearing before the House Committee on Oversight and Reform, several high school students testified that they were now addicted to Juuling, as a result of the company's marketing efforts. One student described how a JUUL representative reassured students in his ninth-grade classroom of the device's safety, stating "For my classmates who were already vaping, it was a sign of relief because now they were able to vape without any concern. I believe that after this meeting, kids were more inclined to vape because now they thought [the JUUL e-cigarette] was just a flavor device that didn't have any harmful substances in it."[30]

36.     The House Committee's investigation further revealed that JUUL spent hundreds of thousands of dollars sponsoring youth summer camps and programs to promote JUUL as "part of a healthy lifestyle."[31]

37.     JUUL has seen astronomical profits as a result of its deceptive marketing efforts. For the year 2019, JUUL has forecasted a net revenue of 3.4 billion dollars, almost triple the amount it generated in 2018.[32] It expects a sales growth of 160 percent in the next year, and its co-founders are now billionaires.[33]

---

[29] Caitlin O'Kane, *Juul came to a 9th grade classroom and told teens their products were "totally safe,"* CBS News (July 25, 2019), https://www.cbsnews.com/news/juul-came-to-a-9th-grade-classroom-and-told-teens-their-products-were-totally-safe-according-to-teens-testimonies/.
[30] *Id.*
[31] Sheila Kaplan, *Juul Targeted Schools and Youth Camps*, New York Times (July 25, 2019), https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.
[32] Oliviz Zaleski, *Juul Expects Skyrocketing Sales of $3.4 Billion*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.
[33] Kenrick Cai, *Juul Funded High Schools, Recruited Social Media Influencers to Reach Youth*, Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#7a81bc6933e2.

**D. The E-Cigarette Public Health Crisis**

38.     As of today, approximately 1 out of every 20 American adults uses e-cigarettes.[34]

1 out of 5 high school students uses e-cigarettes, an amount that has increased by 75 percent in the

last year.[35] In 2018, the FDA announced that the U.S. now faces a youth e-cigarette "epidemic,"

citing JUUL as a primary culprit.[36]

39.     Evidence continues to mount about the deleterious health effects that e-cigarettes

have on users. The JUUL e-cigarette is particularly worrisome because, despite the company's

claims that it is a healthier alternative to a cigarette, it delivers a higher concentration of nicotine

into the bloodstream than other e-cigarettes. Nicotine is known to impair brain and lung

development in adolescents and contribute to myriad health problems, including heart disease and

stroke in adults. It is highly addictive, can adversely impact a person's heart, reproductive system,

lungs, and kidneys, and is a known carcinogen.[37]

40.     Additionally, a 2017 study found that e-cigarettes, including JUUL, increase the

likelihood that an individual will begin smoking traditional cigarettes within 18 months of use.[38]

41.     JUUL has contributed to this public health crisis not just through its marketing, but

through its easy accessibility and functionality. The JUUL device is small and easy to conceal. It

resembles a USB device and is attractive particularly to young consumers who may wish to hide a

---

[34] *See Id.*; *see also* Lisa Rapaport, *Almost one in 20 U.S. adults now use e-cigarettes*, Reuters (Aug. 27, 2018),
https://www.reuters.com/article/us-health-ecigs-us-adults/almost-one-in-20-u-s-adults-now-use-e-cigarettes-
idUSKCN1LC2DN.
[35] Laurie McGinley, *FDA Chief calls youth e-cigarettes an 'epidemic*,' The Washington Post (Sept. 12, 2018),
https://www.washingtonpost.com/national/health-science/fda-chief-calls-youth-use-of-juul-other-e-cigarettes-an-
epidemic/2018/09/12/ddaa6612-b5c8-11e8-
a7b5adaaa5b2a57f_story.html?noredirect=on&utm_term=.50ab45aa4320.
[36] *Id.*
[37] Aseem Mishra et al., Harmful effects of nicotine, Indian J. Med. Paediatric Oncology (2015),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/
[38] *Supra* Note 19.

vaping habit from parents. In fact, retailers often sell JUUL "wraps" or "skins," which are colorful decals allowing users to further conceal and customize their device with colors and patterns.



42.     The product is also easy to obtain. Despite age limitations, 74 percent of young users reported purchasing the device at a retail outlet.[39] Over half reported that they received JUUL from a social source, friend, or family member.[40] Purchase via internet is also simple; among youth who attempted to purchase the product online, 89 percent succeeded.[41]

43.     In September 2018, the Food and Drug Administration announced a crackdown on e-cigarettes, targeting more than 1,300 retailers with warning letters and civil penalties for selling e-cigarettes to minors.[42]

---

[39] Truth Initiative, *Where are Kids Getting Juul?*, TruthInitiative.org, https://truthinitiative.org/research-resources/emerging-tobacco-products/where-are-kids-getting-juul (last visited Aug. 6, 2019).
[40] *Id.*
[41] *Id.*
[42] Ryan W. Miller, *Juul to halt sale of flavored e-cigarette products*, USA Today (Nov. 13, 2018), https://www.usatoday.com/story/news/health/2018/11/13/juul-flavored-e-cigarette-products-social-media-fda-crackdown/1990688002/.

44.     As part of this crackdown, the FDA seized more than one thousand pages of documents from JUUL Labs to investigate the company's deceptive sales and marketing campaigns. To date, the government has yet to regulate the sale of JUUL e-cigarettes.

45.     Several other state and municipal governments have followed suit. In June of 2019, the City of San Francisco banned the sale of e-cigarettes, becoming the first United States City to do so.[43] Additionally, in July of 2018, the Attorney General of Massachusetts announced an investigation of JUUL while sending cease and desist letters to retailers who had sold e-cigarette devices to minors.[44]

46.      In response to backlash, JUUL has issued disingenuous public apologies and promises. In a July 2019 statement to the press, the company's CEO apologized to parents whose children used the product, despite the fact that the government's own investigation revealed that the company had targeted children with their marketing campaign.[45]

47.     JUUL has also ceased sale of its candy-flavored e-cigarettes and has changed its website to make it appear as if its Products were always designed for adult smokers trying to quit, a further falsehood on the company's part.

48.     As of September 12, 2019, the CDC, U.S. Food and Drug Administration (FDA), state and local health departments, and other clinical and public health partners are investigating a multistate outbreak of severe pulmonary disease associated with e-cigarette product (devices, liquids, refill pods, and/or cartridges) use.[46] CDC further reports that as of September 6, 2019, over 450 possible cases of lung illness associated with the use of e-cigarette products have been

---

[43] *Id.*
[44] AG Healey Announces Investigation into Juul, https://www.mass.gov/news/ag-healey-announces-investigation-into-juul-other-online-e-cigarette-retailers-over-marketing (last visited Aug. 6, 2019).
[45] *See supra* Note 27.
[46] https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html#latest-outbreak-information

reported to CDC from 33 states (AR, CA, CO, CT, DE, FL, GA, IA, IL, IN, KS, KY, LA, MD, MI, MN, MT, NC, NE, NJ, NM, NY, OH, OR, PA, SC, TN, TX, UT, VA, VT, WI, WV) and the U.S. Virgin Islands. In addition, six deaths have been confirmed in California, Illinois, Indiana, Kansas, Minnesota, and Oregon.[47]

49.     JUUL continues to market and sell its product across the United States and has benefitted from deceiving American consumers about the JUUL e-cigarette. As a result, of JUUL's marketing efforts, consumers like Plaintiff have purchased a product deleterious to their health without being fully apprised of the full health consequences a JUUL vaping habit entails. Had Plaintiff and the Class known of those consequences, they would not have purchased the JUUL e-cigarette.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this class action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

51.     Plaintiff seeks to represent a Class defined as follows:

All persons residing in the State of Louisiana who purchased the JUUL e-cigarette or JUUL pods for personal use, since the date of first manufacture, who would not have used/consumed said products had they been adequately warned by the manufacturer about the health risks involved with consumption.

All in the United States JUUL products who purchased the JUUL e-cigarette or JUUL pods for personal use, since the date of first manufacture, who would not have used/consumed said products had they been adequately warned by the manufacturer about the health risks involved with consumption.

All persons residing in the State of Louisiana who, at the time of their purchase or procurement, use of JUUL products, were under the age of 18.

All persons in the United State who, at the time of their purchase or procurement, use of JUUL products, were under the age of 18.

---

[47] Id.

52.     Plaintiffs reserve the right to propose subclasses or modify the above class definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

53.     Excluded from the Class are: Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; all governmental entities; and the Judge to whom this case is assigned and any immediate family members thereof.

54.     Certification of the Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

55.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Members of the Class are so numerous that individual joinder of all Class Members would be impracticable. On information and belief, thousands of consumers have been affected by the Defendant's wrongful conduct. The precise number of Class Members and their addresses are presently unknown to Plaintiff but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

56.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

 a. Whether JUUL engaged in a marketing campaign with the intent to deceive consumers;

 b. Whether JUUL knew or reasonably should have known about the likelihood that children and adult nonsmokers would purchase the Product;

 c. Whether JUUL concealed from and/or failed to disclose to Plaintiff and the Class the health consequences and harms posed by using the Product;

d.   Whether JUUL knew or reasonably should have known that its Product would pose a high likelihood of addiction among children and adult nonsmokers who used it;

e.   Whether the claims JUUL made regarding the health and safety of the e-cigarettes were unfair or deceptive;

f.   Whether JUUL knew at the time the consumer transactions took place that consumers were at risk of developing health complications, as a result of using its Product;

g.   Whether JUUL knowingly made misleading statements in connection with consumer transactions that consumers were likely to rely upon to their detriment;

h.   Whether JUUL knew or should have known that the representations and advertisements regarding the Product were unsubstantiated, false, and misleading;

i.   Whether JUUL's acts and omissions violated the Consumer Fraud acts, and Uniform Unfair Trade Practices Acts of the various states as set forth herein;

j.   Whether JUUL has been unjustly enriched by the sale of its Product to Plaintiff and the Class;

k.   Whether JUUL should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the JUUL e-cigarette;

l.   Whether the Plaintiff and the Class suffered monetary damages, and, if so, what the measure is of those damages;

m.   Whether Juul's product is redhibitorily defective pursuant to La. C.C. art 2520.

n.   Whether Juul's product is defective pursuant to the Louisiana Products Liability Act. LSA-.R.S. 9:2800.51, *et seq*.

o.   Whether Plaintiff and the Class are entitled to an injunction, damages, restitution, equitable relief, and other relief deemed appropriate, and, if so, the amount and nature of such relief.

57.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members were similarly injured through the uniform and common misconduct described above.

58.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests do not conflict with the

interests of the other Class Members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and he intends to prosecute this action vigorously. The Class Members' interests will be fairly and adequately protected by Plaintiff and his counsel.

59.     **Declaratory and Injunctive Relief** – **Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class Members as a whole.

60.     **Superiority** – **Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

61.     **Ascertainability - Federal Rule of Civil Procedure 23(b)(3).** The members of the Class are ascertainable as each JUUL e-cigarette contains has a unique serial number.

## CAUSES OF ACTION
## COUNT I

Violation of the Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1962(c)

**(On Behalf of All Classes)**

62.    Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein, and further declare:

63.    Defendants are all "persons" under 18 U.S.C. § 1961(3).

64.    Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of a RICO Enterprise through a pattern of racketeering activity.

65.    Since at least as long as JUUL and the Altria Defendants entered into an agreement with respect to JUUL e-cigarettes, and continuing up to and including the date of the filing of this complaint, Defendants have constituted an "enterprise" as the term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities and individuals associated in fact, which is engaged in, and the activities of which affected, interstate commerce and foreign commerce. Each Defendants participates in the operation and management of the Enterprise.

66.    The Enterprise is functioning to achieve shared goals through unlawful means including to deceive consumers, particularly parents and children, by claiming that they did not market to children, while engaging in marketing and advertising with the intent of addicting children into becoming lifetime nicotine users.

67.    The RICO Enterprise has an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

68.    While Defendants participated in the conduct of the RICO Enterprise, they have

21

an existence separate and distinct from the RICO Enterprise.

69.     At all relevant times, Defendants operate, control or manage the RICO Enterprise through a variety of actions. The participation of Defendants in the RICO Enterprise is necessary for the successful operation of their scheme to market the JUUL nicotine device to children, which is the common purpose of the RICO Enterprise.

70.     At all relevant times, Defendants conducted and participated in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity that consists of numerous and repeated violations of federal mail and wire fraud statutes. These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

71.     As detailed in the General Factual Allegations, Defendants know that marketing JUUL e-cigarettes to youth is essential to Defendants' success and longevity, and for that reason, they partnered to create marketing campaigns to increase youth consumption, while fraudulently denying they are doing so. Defendants have furthered this scheme to profit.

72.     To carry out, or attempt to carry out the scheme to defraud, the Defendants have conducted or participated in the conduct of the affairs of the RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.     The Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Defendants' websites, communications with the FDA, statements to the press, and communications with other members of the RICO Enterprise, as well as advertisements and other communications to JUUL users; and

22

b.      The Defendants utilize the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

73.      The Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and class members were directly harmed as a result of the Defendants' intentional conduct. Plaintiffs, class members, among others, relied on the Defendants' material misrepresentations and omissions concerning their fraudulent statement with respect to targeting children.

74.      The predicate acts all had the purpose of generating significant revenue and profits for the Defendants at the expense of Plaintiffs and Class Members. The Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Equitable relief is necessary to ensure an end to Defendants' continued effort to deceptively campaign to induce children and minors to become addicted and subject to a high risk of disease.

## **COUNT II**

### **VIOLATION OF STATE CONSUMER PROTECTION STATUTES]**
### **On Behalf of Plaintiff and the Class**

75.      Plaintiff incorporates the allegations set forth above as if fully set forth herein.

76.      Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent act or practices in violation of the state consumer protection statutes listed below.  The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiff and members of the Class to purchase Juul products.

23

77.     The actions and failures to act of Defendants, including the false and misleading representations that Juul was not addictive, or not as addictive as cigarettes constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, misrepresentations and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale Juul e-cigarette and Juul pods manufactured by defendants, all in violation of the consumer protection statutes.

78.     Defendants' unfair or deceptive acts and practices were specifically designed to and did induce Plaintiff and the Class to spend millions of dollars for Defendants' products that they would not have spent but for the defendants' conduct.

79.     Defendants intended that Plaintiff and The Class would rely on their materially deceptive practices; and that Plaintiff and members of the Class would purchase or pay for Defendants' products as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact. Defendants' deceptive representations and material omissions to Plaintiff and members of the Class were and are unfair and deceptive acts and practices.  Plaintiff and members of the Class were deceived by Defendants' misrepresentations.

80.     Defendants' actions, as complained of herein, constitute unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes.

81.     As a proximate result of Defendants' misrepresentations, Plaintiff and members of the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions of dollars for Defendants' products that they would not have paid had Defendants not engaged in unfair and deceptive conduct. This injury is of the type the state

consumer protection statutes were designed to prevent and directly results from Defendants'
unlawful conduct.

82.     Under the statutes listed herein to protect consumers against unfair, deceptive,
fraudulent and unconscionable trade and business practices, Defendants are the supplier,
manufacturer, advertiser, and seller that are subject to liability for unfair, deceptive, fraudulent
and unconscionable consumer sales practices.

83.     By engaging in the foregoing conduct, Defendants have violated the following
state Unfair and Deceptive Trade Practices and Consumer Fraud laws:

a.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

b.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

c.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Ark. Code Ann. § 4-88-101, *et seq.*;

d.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

e.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

f.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

g.     Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Del. Code Ann. tit. 6, § 2511, *et seq.*;

h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code Ann. § 28-3901, *et seq.*;

i.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Code Ann. §10-1-392, *et seq.*;

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois Consumer Fraud and Deceptive Bus. Practices Act, 815 Ill. Comp. Stat. 505/1, *et. Seq.*

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*;

o.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

q.      Defendants have engaged in unfair competition or practices in violation of La. Rev. Stat §  51:1401 *et seq.;*

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

26

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. Com. Law Code § 13-101, *et seq.*;

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*;

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*;

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, *et seq.*;

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M Stat.§ 57-12-1, *et seq.*;

cc.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

dd.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

ee.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*;

ff.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, *et seq.*;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*;

ii.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of PA. CONS. STAT. § 201-1, *et seq.*;

jj.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN LAWS § 6-13.1-1, *et seq.*;

kk.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

ll.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

mm.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

nn.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

oo.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq.*;

pp.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451 *et seq.*;

qq.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

rr.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

ss.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq.*;

tt.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT § 100.18, *et seq.*; and

uu.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN § 40-12-101, *et seq.*

84.     As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT III
### VIOLATION OF DECEPTIVE TRADE PRACTICES ACTS

85.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

86.     Plaintiff asserts this claim for violations of the Uniform Deceptive Trade Practices Act ("UDTPA"), which prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, …

uses, [or] benefits … that they do not have," on behalf of a subclass composed of all Class Members who reside in the twenty-two states who have enacted these provisions of the UDTPA.

87.     Defendants engaged in deceptive trade practices in violation of the twenty-two state consumer protection statutes that incorporate the provisions of the UDTPA quoted above, by, *inter alia*, inducing Plaintiff and the Class to spend millions of dollars on Juul e-cigarettes and Juul pods that they would not have paid but for Defendants' fraudulent and unlawful conduct.

88.     Defendants have violated the deceptive trade practices statutes of the following states that incorporate the provisions of the UDTPA quoted above, as follows:

a.     Defendants have engaged in deceptive trade practices in violation of Ala. Code § 8-19-5, *et seq.;*

b.     Defendants have engaged in deceptive trade practices in violation of Alaska Stat. § 45.50.471, *et seq.;*

c.     Defendants have engaged in deceptive trade practices in violation of Cal. Civ. Code § 1770 *et seq.;*

d.     Defendants have engaged in deceptive trade practices in violation of 6 Del. C. § 2532, *et seq.;*

e.     Defendants have engaged in deceptive trade practices in violation of Ga. Code Ann. §§ 10-1-372, *et seq.* 10-1-393, and 26-2-29 *et seq.;*

f.     Defendants have engaged in deceptive trade practices in violation of Haw. Rev. Stat. § 481A-3, *et seq.;*

g.     Defendants have engaged in deceptive trade practices in violation of Idaho Code § 48-603 *et seq.;*

h.     Defendants have engaged in deceptive trade practices in violation of 815 Ill. L.C.S. § 510/2 *et seq.;*

i.     Defendants have engaged in deceptive trade practices in violation of 10 Me. Rev. Stat. Ann. § 1212, *et seq.;*

j.     Defendants have engaged in deceptive trade practices in violation of Mich. Comp. L. Ann. § 445.903 *et seq.;*

k.     Defendants have engaged in deceptive trade practices in violation of Minn. Stat. Ann. § 325D.44 *et seq.;*

l.      Defendants have engaged in deceptive trade practices in violation of Miss. Code Ann. § 75-24-5 *et seq.;*

m.      Defendants have engaged in deceptive trade practices in violation of Neb. Rev. Stat. §§ 81-2,285 *et seq.;*, 87-302 *et seq.*;

n.      Defendants have engaged in deceptive trade practices in violation of N.H. Rev. Stat. § 358-A:2 *et seq.;*

o.      Defendants have engaged in deceptive trade practices in violation of N.M. Stat. Ann. § 57-12-2 *et seq.;*

p.      Defendants have engaged in deceptive trade practices in violation of Ohio Rev. Code § 4165.02 *et seq.*;

q.      Defendants have engaged in deceptive trade practices in violation of Or. Rev. Stat. § 646.608 *et seq.*;

r.      Defendants have engaged in deceptive trade practices in violation of 10 Penn. Stat. § 162.15 *et seq.* and 73 Penn. Stat. § 201-2 *et seq.*;

s.      Defendants have engaged in deceptive trade practices in violation of R.I. Gen. Laws § 6-13-1.1 *et seq.*;

t.      Defendants have engaged in deceptive trade practices in violation of Tenn. Code Ann. § 47-18-104 *et seq.*;

u.      Defendants have engaged in deceptive trade practices in violation of Tex. Bus. & Comm. Code § 17.46, *et seq.*;

v.      Defendants have engaged in deceptive trades practices in violation of Utah Code § 13-11a-3 *et seq.*;

w.      Defendants have engaged in deceptive trade practices in violation of W.Va. Code § 46A-6-102 *et seq.*;

89.      As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT IV
## FRAUD

**On Behalf of All Classes**

90.      Plaintiff incorporates the allegations set forth above as if fully set forth herein.

91.     At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue.

92.     Defendants also fraudulently and deceptively failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUUL pod refills.

93.     Defendants further fraudulently and deceptively failed to disclose to Plaintiffs that JUUL is designed to create and sustain an addiction to nicotine. Defendant also manipulated the formulations of JUUL devices and JUUL pods in ways that could and would impact their potency and addictiveness, and Defendant did so without notifying Plaintiffs. Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

94.     Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs, and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUUL pod.

95.     Defendants had a duty to accurately provide this information to Plaintiffs, and those similarly situated. In not so informing Plaintiffs, and those similarly situated, Defendant breached its duty to each of them. Defendant also gained financially from, and as a result of, its breach.

96.     Defendants concealed material information at all times relevant to this Complaint. Defendants have yet to disclose the truth about JUUL e-cigarettes.

97.     Plaintiffs, and those similarly situated, relied to their detriment on Defendant's fraudulent omissions. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would not have purchased or used JUUL products.

32

98.    Plaintiffs and class members were harmed directly and proximately by Defendants' fraud. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendants' fraud.

99.    Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiff, and those similarly situated.

## COUNT V
## Strict Product Liability - Failure to Warn
## (On Behalf of All Non- Louisiana Classes)

100.   Plaintiff incorporates the allegations set forth above as if fully set forth herein Defendants manufactured, distributed and sold and promoted JUUL, or have partnered to manufacture, distribute, sell and promote JUUL.

101.   At all times relevant, Defendants were well-aware of the dangers of nicotine addiction as described in this complaint.

102.   At all times relevant, Plaintiffs and members of the Class were not aware of and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant JUUL has intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction. Since the Altria Defendants partnered with JUUL, they too intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

103.   In all forms of advertising as well as social media communications, Defendants failed adequately to warn or instruct foreseeable users, including youth and adolescent users, that

JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendants failed adequately to warn in their advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendants marketed their products to minors and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability and increased the level of nicotine that is absorbed by users, making them even more addictive.

104.    The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

105.    The JUUL devices and pods were expected to be used by Plaintiffs and the class without substantial change in their condition from the time of their manufacture or sale.

106.    Plaintiffs and class members were harmed directly and proximately by Defendants' failure to warn. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendants' failure to warn.

## COUNT VI
### Strict Product Liability - Design Defect
### (On behalf of all Non-Louisiana Classes)

107.    Plaintiff incorporates the allegations set forth above as if fully set forth herein

108.    Defendant JUUL designed, engineered, developed, manufactured, fabricated,

assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised,

promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL

pods, which were intended by JUUL to be used as a method of ingesting nicotine and the other

aerosolized constituents of JUUL's nicotine solution. Since the Altria Defendants partnered with

JUUL, they have assisted with one or more of these activities.

109. Defendants knew or, by the exercise of reasonable care, should have known that

JUUL's products under ordinary use were harmful or injurious, particularly to youths and

adolescents, including the Plaintiffs and members of the class.

110. As described in this complaint, Defendants designed and marketed their products

to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the

product.

111. JUUL products are also inherently defective because they contain and deliver

significantly more nicotine than JUUL represents. Moreover, JUUL is unreasonably dangerous

and therefore defective in design because it is made to create and sustain addiction. The risks

inherent in the design of JUUL outweigh significantly any benefits of such design.

112. At all relevant times, Defendants could have employed reasonably feasible

alternative designs to prevent the harms discussed in the complaint.

113. At all relevant times, Plaintiffs and the class were unaware of the design defects

described in the complaint. Further, Defendants knew or had reason to know that youths and

adolescents would not fully realize the dangerous and addictive nature of the JUUL products, and

the long-term complications nicotine addiction can present, or that, due to their youth,

inexperience and/or immaturity of judgment, would recklessly disregard such risks.

114. Plaintiffs and class members were harmed directly and proximately by

Defendants' defectively designed JUUL e-cigarette. Such harm includes significant exposure to

toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendants' defective products.

## COUNT  VII

## UNJUST ENRICHMENT

115.     Through its numerous misleading, unfair and deceptive claims and misrepresentations, Defendant has made over 1 billion dollars from the sale of the Product. The considerable profits were made at the expense of Plaintiff and each Member of the Class, who relied upon Defendant's representations and material omissions.

116.     Plaintiff and Class Members conferred benefits on Defendant by purchasing the Product, which Defendant knowingly appreciated and accepted.

117.     Defendant, however, retained that benefit under circumstances that make it unjust and inequitable for Defendant to retain it without paying Plaintiff and members of the class the value thereof. Specifically, Defendant retained that benefit despite failing to warn purchasers that its e-cigarettes were unsafe for one's health.

118.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class Members for Defendant's unjust enrichment, as ordered by the Court.

## COUNT VIII

### REDHIBITION
### Pursuant to La. C.C. 2520
### On Behalf of Plaintiff and the Louisiana Class

119.   Defendants are sellers of Juul e-cigarettes and Juul pods in the state of Louisiana. As sellers, Defendants warrant the buyer (Plaintiff and the Louisiana Class) against redhibitory vices or defects in the things sold.

120.    A redhibitory vice or defect is one which renders the thing useless or its use so inconvenient that it must be presumed that the buyer would not have bought the thing had the buyer known of the vice or defect.

121.   The defendants Juul e-cigarettes and Juul pods are redhibitorily defective in that they are as addictive or more addictive than cigarettes, and are dangerous to the user's health.

122.   It is presumed that had Plaintiff, or members of the Louisiana Plaintiffs Class known of the vices or defects in the  Plaintiff and members of the  Louisiana Plaintiffs Class would not have purchased the products.

123.   As a result of the vices or defects Plaintiff and members of the Louisiana Plaintiffs Class are entitled to rescission of sale of said products, and attorneys' fees.

## COUNT IX

### LOUISIANA PRODUCTS LIABILITY ACT La. R.S. 9:2800.51 *et seq*
### Design Defect and Failure to Provide Adequate Warning
### On Behalf of Plaintiff and the Louisiana Plaintiff Class

124.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

125.   Defendant JUUL designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL

pods, which were intended by JUUL to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution. Since the Altria Defendants partnered with JUUL, they have assisted with one or more of these activities.  Therefore, Defendants are manufacturers pursuant to the Louisiana Products Liability Act.

### Failure to Warn

126.   At all times relevant, Defendants were well-aware of the dangers of nicotine addiction as described in this complaint.

127.   At all times relevant, Plaintiffs and members of the Louisiana Class were not aware of and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendants have intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction. Since the Altria Defendants partnered with JUUL, they too intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

128.   Defendants knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including the Plaintiffs and members of the class.

### Design Defect

129.   As described in this complaint, Defendants designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product.

130.   JUUL products are also inherently defective because they contain and deliver significantly more nicotine than JUUL represents. Moreover, JUUL is unreasonably dangerous and therefore defective in design because it is made to create and sustain addiction. The risks

inherent in the design of JUUL outweigh significantly any benefits of such design.

131.    The design defect in the Defendants Juul e-cigarettes and Juul Pods existed at the time the products left the defendants' control.

132.    At all times relevant there existed alternative designs capable of preventing or reducing Plaintiff and Louisiana Class Members' injuries, and therefore Defendants could have employed reasonably feasible alternative designs to prevent the harms discussed in the complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff BCBSLA, individually and on behalf of the Class described herein, respectfully pray for the following relief:

A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), appointment of Plaintiff as a representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;

B.    Enter joint and several judgments against Defendants in favor of Plaintiff and the Class.

C.    A finding that Defendants' wrongful conduct alleged herein violated the consumer fraud and protection statutes and deceptive trade practices statutes set forth above, and an award for all measures of damages allowable under such statutes, in an amount to be determined at trial, plus costs of suit, including reasonable attorneys' fees and litigation expenses;

D.    Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

E.    Grant Plaintiff and the Class an award for damages and, where applicable, treble, multiple, punitive, and/or other damages, in a such amount to be determined at trial and as provided by applicable law;

F.    Grant Plaintiff and the Class pre-judgment and post-judgment interest on all damages;

G.    Grant Plaintiff and the Class costs of suit, including reasonable attorneys' fees and litigation expenses as provided by law; and

H.    Grant Plaintiff and the Class all such other and further relief as necessary to correct Defendants' unlawful conduct, and as the Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: September 16, 2019              Respectfully submitted:

**THE DUGAN LAW FIRM, APLC**

*/s/ James R. Dugan, II*
James R. Dugan, II (LSBA# 24785)
David Scalia (LSBA #21369)
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
Email: jdugan@dugan-lawfirm.com
Email: dscalia@dugan-lawfirm.com


And

**FRANK J. D'AMICO, JR., APLC**
Frank J. D'Amico, Jr. (17519)
New Orleans, Louisiana 70113
Telephone No.: (504) 525-7272
Facsimile No.: (504) 525-9522


*Attorneys for Plaintiff, and the Proposed Classes*